CONTINENTAL ASSURANCE COMPANY *et al.*, Plaintiffs-Appellants, v. COMMONWEALTH EDISON COMPANY, Defendant-Appellee.

First District (5th Division) No. 1—88—1502

Opinion filed March 2, 1990.

Stanley J. Adelman and William M. McErlean, both of Rudnick & Wolfe, of Chicago, and Brackett B. Denniston III and Michael J. Tuteur, both of Goodwin, Procter & Hoar, of Boston, Massachusetts, for appellants United Services Automobile Association and USAA Casualty Insurance Company.

James E. Spiotto, Ann Acker, and Donna Ross Daniels, all of Chapman & Cutler, of Chicago, for appellants Continental Assurance Company and Continental Casualty Company.

Altheimer & Gray, of Chicago (Theodore J. Low and Brian C. Witter, of counsel), for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Continental Assurance Company, Continental Casualty Company, McDonnell Douglas Finance Corporation, United Services Automobile Association, and USAA Casualty Insurance Company (shareholders) appeal from the dismissal of their complaint challenging Commonwealth Edison Company's redemption of a stock issuance.

We reverse in part and affirm in part.

In 1982, Commonwealth Edison Company (Edison) issued 300,000 shares of $15 "Cumulative Preference Stock without Par Value" ($15 Series). Together, the shareholders accounted for the purchase of 330,000 of the shares. Edison created the $15 Series pursuant to a "Statement of Resolution Establishing Series Adopted by Board of Directors" (Resolution) adopted July 14, 1985. Section V of the Resolution contained a provision for Edison to redeem the $15 Series. Section V provided:

"*SPECIAL REDEMPTION.* The share of the $15.00 Series may be *** redeemed *** at any time *** on or after the effective date of any statute of the United States of America, or any regulation of the Department of the Treasury, or any rul-

ing, technical advice, finding or determination of the Internal Revenue Service of the United States of America ***, enacted, promulgated, published or issued after the date of adoption of this resolution creating the $15.00 Series, *which statute, regulation, ruling, technical advise, finding or determination would, in the reasonable and good faith determination of [Edison], cause any corporate holder of the $15.00 Series to lose the benefit of, lose the right to claim, or suffer disallowance with respect to, all or any part of the 85% dividend[s] received deduction provided for by Section 243 (a)(1) of the Internal Revenue Code of 1954, as amended [.]"* (Emphasis added.)

Approximately four years after the shareholders purchased the $15 Series, Congress, as part of the Tax Reform Act of 1986, reduced the dividends received deduction (DRD) from 85% to 80%, effective January 1, 1987. See Tax Reform Act of 1986, Pub. L. No. 99—514, §611, 100 Stat. 2085, 2249-50 (1986).

Based on that reduction, Edison advised the shareholders that on February 1, 1987, Edison would redeem outstanding shares of the $15 Series pursuant to section V of the Resolution. Edison proceeded to redeem the shares on January 30, 1987, by crediting bank accounts of the shareholders.

On September 18, 1987, the shareholders filed a six-count complaint challenging Edison's redemption. Common to each count, the shareholders alleged that, although the DRD had been reduced in the Tax Reform Act of 1986, the reduction had been more than offset by changes in corporate tax rates taking effect July 1, 1987. The complaint stated that, prior to the Tax Reform Act of 1986, corporate income was taxed at the maximum rate of 46%. Under the 85% DRD, dividends were thus taxed at a maximum rate of 6.9% (46% x 15%). However, under the Tax Reform Act of 1986, the maximum corporate income tax rate was lowered to 34%, effective July 1, 1986. Had the DRD not been reduced, dividends would have been taxed at a maximum rate of 5.1% (34% x 15%). Thus, the shareholders alleged, Congress reduced the DRD to compensate for the lower maximum corporate income tax rate. Given the new corporate income tax rate and reduced DRD, dividends would be taxed at a maximum of 6.8%. Because, shareholders alleged, they had lost no real benefit derived from the DRD, as reduced, the shareholders alleged Edison could not have made "a reasonable and good faith determination" that a shareholder would lose all or part of the DRD to justify redemption pursuant to section V.

Based on the allegations as summarized above, the shareholders

sought, in their complaint, rescission (count I), injunctive relief (count II), declaratory relief (count III), damages for breach of contract (count IV) and fiduciary duty (count V), and damages or, alternatively, injunctive relief for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.*) (count VI).

Edison successfully moved to dismiss the complaint pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—615). In his ruling, the trial judge determined section V was expressly incorporated into the Agreement and that the language "loses the right to claim a part of the dividend[s] received deduction" contained in section V controlled disposition of the case. The trial judge determined that the language permitted Edison to redeem the $15 Series because the DRD had, in fact, been reduced from 85% to 80% under the Tax Reform Act of 1986.

This appeal followed.

OPINION

 Because this appeal concerns the propriety of the dismissal of the shareholders' complaint, we must accept as true all properly pleaded facts and are concerned only with the question of law presented by the pleadings. (*Fancil v. Q. S. E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538.) We note that the construction, interpretation, or legal effect of a contract presents such a question. (*Premier Electrical Construction Co. v. La Salle National Bank* (1984), 132 Ill. App. 3d 485, 477 N.E.2d 1249.) In construing a contract's terms, the primary object is to give effect to the parties' intentions. (*Srivastava v. Russell's Barbecue, Inc.* (1988), 168 Ill. App. 3d 726, 523 N.E.2d 30.) And, absent ambiguity in its written terms, that intention is to be derived solely from the language of the instrument. *Faerber Electrical Co. v. International Telephone & Telegraph Corp.* (1984), 123 Ill. App. 3d 704, 463 N.E.2d 820.

The shareholders' principal argument on appeal is that the trial judge failed to give due weight to language in section V requiring Edison to make a good-faith determination that a change in the tax law affected the parties. More specifically, the shareholders argue that the trial judge failed to read section V in conjunction with paragraph 8 of a separate "Purchase Agreement" (Agreement) also executed by the parties on July 14, 1982. Paragraph 8 of the Agreement provided, in part:

> "*Tax Indemnity. This Agreement has been entered into on the assumptions that for Federal income tax purposes *** the divi-*

*dends on the Shares will be eligible for the Dividends Received Deduction.* If under any circumstances or for any reason whatsoever [the shareholder] shall lose the benefit of, lose the right to claim or suffer disallowance with respect to, all or any part of the Dividends Received Deduction with respect to *** the Shares (any such treatment, loss or disallowance being hereinafter called a 'Loss'), then, *** (A) [Edison] shall pay to [the shareholder] not later than 60 days following written notice to [Edison] *** of such loss, such sums as *** shall be required, in the reasonable opinion of [the shareholder] to cause the effective after-tax yield of [the shareholder] to be 13.965% per annum, and (B) *** [Edison] shall pay to [the shareholder] *** such sums as, when taken together with the dividends paid to [the shareholder], *** shall be required in the reasonable opinion of [the shareholder] *** to cause the effective after-tax yield of [the shareholder] *** to be 13.965% per annum [.] *** *If [Edison] shall *** redeem Shares pursuant to Section V of the Resolution, [Edison] shall pay to [the shareholder] in addition to *** the redemption price specified in Section V of the Resolution *** such sums as *** shall be required *** to cause the effective after-tax yield of [the shareholder] *** to be 13.965% per annum."* (Emphasis added.)

The shareholders argue that, when read together with paragraph 8 of the Agreement, section V obligates Edison to consider the ultimate impact of reduction of the DRD in light of the decrease in the corporate income tax rate after July 1, 1987. Because, shareholders point out after July 1, 1987, dividends were taxed at an effective rate of 6.8%, a rate actually .01% lower than the rate prior to reduction of the DRD effective January 1, 1987, the shareholders were not deprived of the benefit of the DRD. Shareholders point out that, if the right to redeem was solely dependent on mathematical reduction of the DRD, the language of section V of the Resolution pertaining to Edison's good-faith determination would be meaningless. The shareholders argue the use of such language in section V is at least sufficient to render the terms of the contract ambiguous, thus precluding grant of Edison's motion to dismiss. Shareholders direct our attention to *American Home Assurance Co. v. Baltimore Gas & Electric Co.* (2d Cir. 1988), 845 F.2d 48, decided by the United States Court of Appeals for the Second Circuit, which shareholders argue supports their analysis.

*American Home* involved interpretation of a tax indemnity provision of a stock purchase agreement substantially identical to para-

graph 8 of the Agreement in the instant case. In section 6.2 of the stock purchase agreement in *American Home*, Baltimore Gas & Electric Company (BG & E) agreed to pay any of plaintiff shareholders, several insurance companies, such sums as would preserve an effective after-tax yield of 11.172% per annum, if the shareholder lost "the right to claim or suffer disallowance with respect to all or any part" of the DRD. Section 6.2 further provided for the repurchase of shares at par value if one of two events occurred: (1) a shareholder gave written notice of loss of all or part of the DRD, or (2) BG & E made a "good faith determination that there is substantial risk that it *would* be required to make any indemnity payments" pursuant to the section. (Emphasis added.) *American Home*, 845 F.2d at 49.

Citing the same reduction of the DRD relied on by Edison, BG & E notified shareholders of its intent to repurchase pursuant to section 6.2. The shareholders sued to void the repurchase, alleging BG & E did not make the requisite good-faith determination of financial risk. BG & E sought, unsuccessfully, to dismiss the complaint, and the district court thereafter granted summary judgment in favor of the shareholders.

The second circuit affirmed. In its decision, the second circuit concluded the indemnity provision was not self-generating and depended on a shareholder's written notice of loss of the DRD. Because of that determination, the court concluded, in order to repurchase shares under the second triggering event (the good-faith determination that there was substantial risk that BG & E would be required to indemnify), BG & E was required to consider whether a shareholder would, in fact, send a written notice of loss. (*American Home*, 845 F.2d at 51.) The court noted, incidentally, that, because the market value of the shares exceeded the amount for which the shares could be redeemed by $8,780,000 and because the 5% reduction in the DRD would have only a small impact on after-tax yield, no shareholder had requested indemnification. *American Home*, 845 F.2d at 49-50.

Pertinent here, the second circuit rejected BG & E's argument that the word "would" referred to whether circumstances were such that BG & E had to indemnify a shareholder if the written notice of loss was sent. The court stated:

> "If we interpreted 'would' in this manner, then BG & E would have the right to redeem the *** Shares if there is any change in the tax laws that slightly reduces the [shareholder's] DRD, whatever the likelihood that any [shareholder] would choose to exercise its right to indemnity payments because of the change in the law. If the contract were interpreted in this manner,

then it would be difficult to give any meaning to the phrases 'good faith determination' and 'substantial risk.' For example, there ordinarily is no reason to introduce an element of 'good faith' into a 'determination' whether a provision of the Internal Revenue Code has been amended. Similarly, under this interpretation of the contract, any change in the tax laws that reduces the DRD, even by an infinitesimal amount, would automatically confer upon BG & E the right to redeem the stock. Thus, no determination at all about the 'risk' of making indemnity payments would have to be made if 'would' were given such an interpretation." (*American Home*, 845 F.2d at 51-52.)

Thus, the court concluded, the contract could not be read to permit BG & E the right to redeem the shares, based on a change in tax laws slightly reducing the DRD, without consideration of whether a substantial risk existed that shareholders would request indemnity payments because of the change. *American Home*, 845 F.2d at 52.

Although we recognize Edison's purported redemption in the instant case was based on the special redemption provision of section V of the Resolution, and, unlike *American Home*, was not a repurchase pursuant to the Agreement's tax indemnity provision, we find the second circuit's analysis helpful to interpreting the operative language of section V. Under section V, Edison is entitled to redeem the $15 Series "on or after the effective date of any statute *** which *** would in the reasonable and good faith determination of [Edison], cause any corporate holder of the $15.00 Series to lose the benefit of, lose the right to claim, or suffer disallowance with respect to all or any part of the 85% [DRD][.]" As the second circuit noted in *American Home*, no reason exists to introduce an element of good faith into a determination of an arithmetic change in the percentage of DRD through amendment of the Internal Revenue Code. We therefore agree with shareholders that an interpretation of section V suggesting that an arithmetic change in the DRD could alone provide basis for redemption, would render language pertaining to good faith meaningless.

Moreover, we are persuaded that Section V cannot be read independently of paragraph 8 of the Agreement. Paragraph 8 expressly grafts onto section V, in the following quoted language, Edison's obligation to provide tax indemnity to preserve a predetermined annual yield if shares are redeemed pursuant to that section:

"If [Edison] shall *** redeem Shares pursuant to Section V of the Resolution, [Edison] shall pay to [the shareholder] in addition to *** the redemption price specified in Section V of the

Resolution *** such sums as *** shall be required *** to cause the effective after-tax yield of [the shareholder] *** to be 13.965% per annum."

We also note that paragraph 8 of the Agreement expressly provides that the entire purchase Agreement "has been entered into on the assumptions that for Federal income tax purposes *** the dividends on the Shares will be eligible for the [DRD]."

▪ Reading the above provisions together, it would appear that the inference to be drawn is that Edison may not redeem the shares unless a change in tax laws has caused a real and detrimental change in the shareholders' after-tax rate of return. Only such interpretation would seem to give real meaning to Edison's obligation, in section V, to make a "reasonable and good faith determination" regarding change in the DRD. At a minimum, we are convinced that an ambiguity exists with respect to the purpose of section V in light of the language used in that section, as well as the effect of paragraph 8 thereon, precluding conclusive determination of the parties' intentions solely from the documents. To that extent, we conclude the shareholders' complaint should not have been dismissed.

▪ However, we cannot conclude allegations in count VI provide basis for liability based on violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) (Ill. Rev. Stat. 1987, ch. 121½, par. 261, *et seq.*). Although, under the Act, the shareholders, corporate entities, may be considered consumers (see McDonald, *The Applicability of the Illinois Consumer Fraud & Deceptive Business Practices Act to Private Wrongs*, 39 DePaul L.R. 95, 109-21 (1989)) and the securities merchandise (see *Onesti v. Thomson McKinnon Securities, Inc.* (N.D. Ill. 1985), 619 F. Supp. 1262; *People ex rel. Scott v. Cardet International, Inc.* (1974), 24 Ill. App. 3d 740, 321 N.E.2d 386), count VI must fail because Edison's alleged misrepresentations, occurring in conjunction with a stock redemption, relate to a transaction outside of the scope of those to which the Act is designed to apply.

▪ Section 2 of the Act prohibits, in pertinent part, "any deception, fraud, false pretense, false promise, misrepresentation *** in the conduct of any trade or commerce[.]" (Ill. Rev. Stat. 1987, ch. 121½, par. 262.) Section 1 defines the terms "trade" and "commerce" collectively as:

"[T]he advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or com-

merce directly or indirectly affecting the people of this State." Ill. Rev. Stat. 1987, ch. 121½, par. 261.

In count VI of the complaint, shareholders alleged Edison "repeatedly falsely stated and held out that it was redeeming the Stock based on its determination that the [DRD] has been reduced *** and omitted and failed to state that its true purpose was to avoid paying the dividends on the stock and to reduce its cost of funds, by replacing the Stock with other sources of funds, at less cost[.]"

■ Although we recognize the Act is to be liberally construed, we cannot conclude the Act can be reasonably interpreted to include the type of fraud alleged by shareholders here in the context of a stock redemption. The redemption of shares of stock cannot constitute any type of "advertising" or "offering for sale." No more so, in our opinion, can the redemption in the instant case constitute a "sale" or "distribution" of property as those terms are used in the Act. While, conceivably, it might be argued Edison's redemption is not precluded from being considered a sale or distribution of property to the extent the shareholders would be selling or distributing the shares back to Edison, that transaction could not serve as basis for liability under the Act because, in such circumstance, Edison would be the consumer and Edison is not seeking the Act's protection.

Therefore, for reasons stated above, we reverse the dismissal of counts I through V of shareholders' complaint. We affirm the dismissal of count VI. We remand the matter for further proceedings not inconsistent with this opinion.

Reversed in part; affirmed in part and remanded.

MURRAY and GORDON,* JJ., concur.

---

*Justice R. Eugene Pincham participated in the above-entitled cause prior to his resignation. Justice Joseph Gordon was designated the third member of the panel and has read the record and briefs and has listened to a recording of the oral arguments.