**AVIATION CONSTRUCTORS, Munoz, Castle, A Joint Venture, Consisting of Aviation Constructors, Inc., Alex Munoz General Contractor, Inc., and Castle Construction Corporation, Plaintiffs,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

No. 91 C 2835.

United States District Court, N.D. Illinois, E.D.

Feb. 2, 1993.

Mark Blocker, Aidley & Justin, Chicago, IL, for plaintiffs.

Howard C. Emmerman, Katz, Randall & Weinberg, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The plaintiff in this contract dispute, a joint venture consisting of Aviation Constructors Inc., Alex Munoz General Contractor, Inc., and Castle Construction Corp., (collectively "ACI"), has moved for partial summary judgment on the complaint,[1] summary judgment on defendant Federal Express Corporation's ("Federal Express") counterclaim, and for sanctions. For the following reasons, we deny plaintiff's motions for partial summary judgment on the complaint, deny in part and grant in part its motion for summary judgment on the counterclaim, and grant its motion for sanctions.

### I. Factual Background

In 1988, Federal Express began work on the design and construction of a 287,000 square foot Metroplex Terminal at O'Hare International Airport. Having hired Teng & Associates to design the facility, the project proceeded on a fast track, with some portions of the project being built while others were still being designed. Federal Express divided the construction work into five bid packages, and entered into separate agreements with different contractors on each of them.

In June 1988, ACI agreed with Federal Express to perform Bid Package No. 3. The relevant contract contained three parts. First, ACI was to construct the foundation walls and underground utilities for the cargo facility. Federal Express agreed to pay $2,420,783 for the work, which was to be completed by December 2, 1988. Second, ACI agreed to provide administrative and coordinating services. Under the contract, Federal Express reserved the right to assign bid packages and subcontractors to ACI. For a fee, ACI would then administer or coordinate the subcontractors' activities. The fee was to be based on the value of the assigned subcontracts and was to be calculated on a sliding scale. ACI was to receive a maximum fee of $1,400,000 for subcontracts exceeding $35 million. Finally, ACI was to provide general conditions and coordination from December 2, 1988 through April 1, 1990 (the projected completion date for the entire

---

1. ACI has filed two separate motions for partial summary judgment.

Metroplex) for work subsequent to the construction specified in Bid Package No. 3. Federal Express was to pay $49,224 per month for this service, with the total fee for the general conditions not to exceed $787,-584.

Under the contract, ACI was to furnish a performance bond in the amount of its fees. For its part, Federal Express was to reimburse the contractor for the cost of the bond.

On December 26, 1989, Federal Express took partial occupancy of the facility. In 1990, after disagreements had erupted between the parties, ACI filed suit against Federal Express to recover on the contract. Federal Express answered the complaint and counterclaimed for over $1 million dollars.[2] $885,960 of the counterclaim stemmed from Federal Express' allegation that the project should have been completed prior to December 26, 1989.

In April, 1991, ACI served a request for "[a]ll reports, diaries, logs or other such documents, including site studies, test reports, daily and weekly reports, supervisor's diary, periodic status reports, internal status report memoranda, informal notes, and meeting minutes." Federal Express did not turn over any project status reports at that time.

In February, 1992, ACI deposed James E. Gibson, a Federal Express employee, who testified that monthly project status reports were issued on the Metroplex project. In March, six such status reports were turned over to plaintiff, three of which (September, November, and December, 1989) indicated that partial occupancy would occur on December 23, 1989, and stated that this was six months ahead of schedule. On April 3, 1992, defendant voluntarily dismissed those counterclaims relating to the alleged delay.

## II. Discussion

### A. First Motion for Partial Summary Judgment on the Complaint

In its first motion for partial summary judgment on the complaint, ACI seeks judgment on the amounts due it under the contract for (1) administration of subcontracts, (2) provision of general conditions, and (3) payment of performance bonds. We address each of these issues in turn.

#### (i) Fee for Administration

ACI claims that it is due $1,400,000 for its administration of subcontracts, since total subcontracts exceeded $35 million. While Federal Express concedes that total subcontracts exceeded $35 million, it contends that plaintiff was to be compensated only for the value of assigned subcontracts—that is, subcontracts which Federal Express entered into and then assigned to plaintiff, or subcontracts that Federal Express asked ACI to enter into directly. Defendant further asserts that the value of the assigned subcontracts only amounts to $22,693,353.50. At bottom, then, this is a question of contract interpretation: was plaintiff's fee to be based on the value of all subcontracts, regardless of their assignment, or was the fee only to cover the value of subcontracts directly assigned to ACI.

■ When a contract is clear on its face, the plain language of the document controls, and the agreement must be enforced as written. *Federal Deposit Insurance Corp. v. Zaborac*, 773 F.Supp. 137, 140 (C.D.Ill.1991). Where the contract is ambiguous, however, the court must resort to extrinsic evidence to interpret the meaning of the documents and the intent of the parties. *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 456 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). A contract is ambiguous if it is susceptible to more than one meaning. *MacDonald–Smith v. FMC Corp.*, 713 F.Supp. 264, 268 n. 2 (N.D.Ill.1989), *aff'd*, 902 F.2d 37 (7th Cir. 1990). In Illinois, ambiguity exists when either the agreement itself is unclear, or when, despite clear language, "anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen." *Federal Deposit Insurance Co. v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989), *cert.*

---

**2.** Defendant did not detail the nature of its counterclaims until *August 22, 1991, in Supplemental* Answers to Interrogatories.

*denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

 The contract between ACI and Federal Express is susceptible to more than one interpretation. Exhibit A–8 to the contract provides for a "[g]eneral construction fee for administration of sub-contractors." Exh. A–8, Part II. The exhibit also states that "Federal may enter directly into a construction agreement with subcontractors," and that "Federal, at its option, may assign the administration of its contracts to the General Contractor [Aviation Construction] for a fee in accordance with Part II of Exhibit A–8." Exh. A–8, E(i). Finally, Federal Express' Project Manager was to inform Aviation Construction in writing of any subcontract assignments. While this language can be read to mean that Federal Express might manage a subcontract on its own, avoiding any fees to plaintiff, the contract says nothing about Federal Express retaining subcontracts and administering them directly. Nor does the contract mention the manner in which the two parties were to "co-administrate" subcontracts. Without a provision detailing the whens and hows of co-administration, the language might also be read to mean that plaintiff's fee was to be calculated based on the total value of subcontracts. Accordingly, we find the contract language ambiguous with respect to whether all, or only directly assigned, subcontracts were to be considered in arriving at plaintiff's fee.

Because of the ambiguity regarding the manner in which the plaintiff's fee for administration was to be calculated, we look to the extrinsic evidence put forth by the parties in order to explain the terms of the agreement. If a genuine dispute regarding a material fact remains, summary judgment is inappropriate. Here, the evidence presented is sparse. Plaintiff's offer the deposition testimony of defendant's expert, Myron E. Oppenheim. In his deposition, Oppenheim stated that he interpreted the contract to mean that plaintiff's fee was to be based on the value of all subcontracts.[3] There is no evidence, however, indicating how the parties actually managed the subcontracts during the operation of the agreement. Accordingly, there is nothing to shed light on whether the parties each administered some of the contracts, or whether plaintiff was solely responsible for that task. Because the evidence presented is sparse and fails to resolve the meaning of the contract, a question of fact remains. Accordingly, we deny summary judgment with respect to the amount due plaintiff for administration of subcontracts.

(ii) The General Condition Fee

 Both parties agree that, under the contract, "this contractor [ACI] has to provide general conditions and coordination for the project beyond the completion date of Bid Package No. 3 work for the period from December 2, 1988 to April 1, 1990." Exh. A–8, Part III. For this service, Federal Express was to pay plaintiff $49,224 a month, with the total lump sum fee not to exceed $787,584.[4] ACI now claims that Federal Express owes it $787,584 for providing general conditions from December 1, 1988 until April 1, 1990.[5] Federal Express rejoins that plaintiff did not, in fact, provide general conditions as required by the contract. Moreover, defendant asserts that plaintiff cannot recover on the contract because it failed to fulfill its obligations under the agreement.

Neither party has offered any evidence of what "general conditions" plaintiff was to provide. ACI, however, has offered some evidence that, whatever the conditions were,

---

3. Although Federal Express argues that plaintiff utilized a truncated portion of Oppenheim's testimony, defendant failed to direct us to additional testimony which would challenge plaintiff's excerpts.

4. The period described in the contract was 16 months. Sixteen months of work at $49,224 per month amounts to $787,584.

5. Actually, plaintiff asserts that it provided general conditions for longer than 16 months, and that

it provided "extras" beyond the requisite general conditions. Consequently, plaintiff contends that Federal Express owes it more than $787,584. This dispute, however, is not the subject of this motion. Plaintiff concedes that the term "general conditions" is ambiguous in the contract, but argues that this ambiguity goes to its claim that it provided "extras," rather than to the question of whether ACI provided general conditions for the requisite 16 months.

it provided them. Specifically, plaintiff has tendered two letters sent to ACI by Federal Express' Project Manager, Bill Smith. In these letters, Federal Express lists the amounts due to plaintiff. One of the items on the list is $787,584 for provision of general conditions. Federal Express has not offered any evidence directly rebutting these letters. However, since writing the letters, Federal Express has contended that ACI did not perform as required, and that it only owes the contractor 65% of the fee. *See* Supplemental Interrogatory Response No. 4, Aug. 22, 1991. Because it is unclear what "general conditions" were to be provided, there exists a genuine dispute as to whether plaintiff is due the full $787,584. Accordingly, we deny summary judgment.[6]

### (iii) Payment for Performance Bond Premium

■ Section 21.01 of the contract requires that "the contractor shall furnish and keep in force throughout the performance of the work a performance bond and a labor and material payment bond in the amount of the contractor's fee as the same may be modified from time to time." The section further provides that "the cost of the bonds as reflected in the contractor's bid for the work is not included in the contractor's fee and shall be paid separately by Federal [Express] upon receipt of an invoice from the contractor's surety." ACI asserts that it purchased the required bond and incurred a fee of $108,690, and directs us to Bob Joyner's Affidavit for support. However, we are unable to find anything in the Joyner Affidavit which mentions the purchase of a bond or the tender of an invoice to Federal Express.

6. Defendant also maintains that plaintiff cannot recover on the contract because it has failed to fulfill several other contractual obligations. For a discussion of the other provisions ACI allegedly failed to perform, see section II–B below.

7. Plaintiff makes its request for pre-judgment interest in its Supplemental Memorandum in Support of Second Amended Motion for Partial Summary Judgment.

8. Although ACI disputes this tally, it asks us to take the amount as true for the purposes of this motion.

9. While the original counterclaim, as detailed in the August 22, 1991 Supplemental Answers to

Absent such evidence, we cannot grant summary judgment on this issue.

### B. Second Motion for Partial Summary Judgment on the Complaint

■ In addition to seeking summary judgment on its fee for administration, general conditions, and payment bond, ACI claims that, by its own admission, Federal Express owes plaintiff $152,244. Plaintiff therefore seeks summary judgment on the $152,244 debt, and further asks us to order payment of that amount with pre-judgment interest.[7]

Plaintiff points out that, according to Federal Express, the correct amount due under the contract is $18,964,058.[8] Pretrial Order, p. 16, ¶ 18. Plaintiff also observes that defendant has a $105,000 counterclaim outstanding against ACI.[9] Both parties have agreed that defendant has paid ACI $18,717,-367 thus far under the contract. Accordingly, plaintiff concludes, even if defendant prevails on its counterclaim, there can be no disagreement that Federal Express owes ACI at least $152,244.

As defendant correctly points out, however, a plaintiff in a breach of contract action may not recover if he has failed to substantially perform his own obligations. *See, e.g., Madonna v. Giacobbe,* 190 Ill.App.3d 859, 546 N.E.2d 1145, 1149–50, 138 Ill.Dec. 90, 94–95 (2d Dist.1988); *Goldstein v. Lustig,* 154 Ill.App.3d 595, 507 N.E.2d 164, 107 Ill.Dec. 500 (1st Dist.1987). Here, Federal Express claims that plaintiff failed to provide the general conditions as required under the contract, and charges ACI with breach of at least three other contract provisions.[10]

Interrogatories, was for $1,113,960, Federal Express has voluntarily dismissed $885,960 of the claim, leaving remaining claims totalling $228,-000. We do not understand how plaintiff arrives at its $105,000 figure. However, in the interest of judicial economy, we will assume, *arguendo,* that its numbers are correct, and address the merits of plaintiff's argument.

10. Specifically, defendant maintains that plaintiff did not deliver final releases and waivers of lien, as required under § 4.06(c)(iii), did not pay subcontractors in full as required under § 4.07(iv), and did not indemnify Federal Express against pending suits as required under § 22.01.

Moreover, there are genuine issues of material fact relating to these alleged breaches by the plaintiff.[11] Accordingly, we deny summary judgment on the $152,244 that plaintiff claims is uncontested.[12]

### C. ACI's Motion for Summary Judgment on the Counterclaim

#### (i) Delay

Federal Express filed a counterclaim against ACI seeking over $1 million in unspecified damages. In August, 1991, when defendant detailed the items comprising the alleged damages, it became clear that the bulk of the counterclaim, although not all of it, stemmed from plaintiff's alleged failure to complete the project prior to December 26, 1989.

On March 20, 1992, ACI moved for summary judgment on all or portions of the counterclaim, and on April 3, 1992, Federal Express voluntarily dismissed those counts of its counterclaim relating to delay. Accordingly, we deny as moot plaintiff's motion for summary judgment on those portions of the counterclaim relating to delay.

#### (ii) $20,000 for Backcharges

■ In addition to delay, Federal Express asserts that it is due $20,000 in subcontractor backcharges. Defendant avers that it paid subcontractors $20,000 in backcharges, and that these sums were the responsibility of the contractor. In its motion, plaintiff denies any knowledge of such backcharges. Bob Joyner, who had substantial responsibility for overseeing plaintiff's work on the project, swears that the $20,000 in backcharges has never been reported to ACI. Joyner Aff. at ¶ 14. However, even if ACI is ignorant of these backcharges, there is no evidence that such ignorance protects ACI from liability if, indeed, Federal Express paid charges which were the contractor's responsibility. Accordingly, we deny summary judgment on the $20,000 claim for backcharges.

#### (iii) As-built Drawings

Defendant claims that ACI failed to deliver as-built documents for Bid Package No. 3, and that it is entitled to the $8,000 it spent having an architect research and create such drawings. Plaintiff asserts that it delivered the as-built drawings to Federal Express. See Joyner Aff. at ¶ 15. Given the absence of evidence refuting Joyner's sworn affidavit, we grant summary judgment on the $8,000 claim.[13]

### D. Motion for Rule 11 Sanctions

Plaintiff seeks sanctions for Federal Express' filing of a frivolous counterclaim involving allegations of delay. Contending that either Federal Express and/or its counsel knew about and concealed damaging project status reports, plaintiff claims that at the time the counterclaim was filed, Federal Express and/or its counsel knew, or reasonably should have known, that its delay claims were frivolous.

■ Rule 11 sanctions are appropriate where an attorney or a party puts forth a claim that is not well-founded in fact and/or law. Fed.R.Civ.P. 11. In determining whether to apply sanctions for the filing of a

---

11. At the very least, as we discussed above, it is far from clear what general conditions were required and whether ACI supplied them. Additionally, it is not clear under the contract whether plaintiff's purchase of a bond indemnifying Federal Express against claims by two unpaid subcontractors sufficiently corrects plaintiff's alleged violations of § 4.06(c)(iii). That is, while § 4.06 permits a contractor to furnish a bond in place of releases or waivers from subcontractors, § 4.07 states that Federal Express may withhold payment if the contractor fails to make payments to subcontractors. Not only is there a question of fact as to whether ACI was responsible for making, and therefore failed to make, payments to the subcontractors at issue, but there is an issue of fact as to whether the plaintiff's compliance with § 4.06 mandates payment by defen-

dant even if the contractor has not complied with § 4.07.

12. Because we deny summary judgment on the $152,244, plaintiff's request for pre-judgment interest on that amount is denied as moot.

13. In its counterclaim, defendant also seeks $70,000 in damages for plaintiff's failure to provide temporary heating, $20,000 for plaintiff's failure to execute post-cleanup work, and $110,000 for failure to provide staff as promised. See August 22, 1991 Supplemental Answers to Interrogatories, ¶ 18. In its motion for summary judgment on the counterclaim, however, plaintiff fails to address these claims, let alone offer evidence supporting judgment in its favor. Accordingly, these portions of the counterclaim survive.

frivolous claim, a court must determine whether the claim was well-grounded in fact and law at the time it was filed, and whether counsel made a reasonable investigation under the circumstances of the case. *See, e.g., Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1435 (7th Cir.1987). Plaintiff argues that defendant knew all along that there were project status reports demonstrating that construction was completed ahead of schedule and, consequently, that the delay allegations were not well-grounded in fact.

 In its response, defendant does not discuss the status reports. Instead, Federal Express contends that in May and June of 1989, the parties accelerated the partial occupancy date to August 1, 1989 and reset the completion date from April 1, 1990 to October, 1989. In support of this contention, defendant directs us to numerous documents demonstrating that Federal Express instructed various subcontractors to accelerate their completion dates. Defendant asserts that these documents amply supported the delay allegations in the counterclaim.

Implicit in Federal Express' response is the argument that even if defendant *had* been aware of the status reports at the time the counterclaim was filed, it had sufficient support for its claims of delay. However, this position is belied by Federal Express' abrupt and unexplained decision to dismiss the delay claims once the reports came to light. Without an explanation of its decision, it is difficult to avoid the obvious conclusion that Federal Express understood that the status reports negated their claim.[14]

Imposition of sanctions, then, turns upon whether or not defendant or its counsel was aware of the status reports at the time the counterclaim was filed, or with reasonable investigation should have been aware of them. Not surprisingly, there is no direct evidence that defendant or its counsel knew of and intentionally concealed the status reports. However, there is significant circumstantial proof. First, Gibson testified that the project manager for Metroplex would have authored any status reports. *See* Gibson Dep. at p. 74. The project manager for Metroplex was Bill Smith, and he was interviewed by counsel about the alleged delay prior to the filing of the counterclaim. *See* Emmerman Aff. at ¶ 2.

Second, defendant's response to the Rule 11 motion has several notable gaps. It is curious, and not a little suspicious, that in its brief, defendant never comments on the status reports. Although it would be a simple matter, nowhere does Federal Express deny having known about the reports at the time of filing. Nowhere does defendant contend that it knew of the reports, but believed that they were irrelevant to the counterclaim. Taken together, this evidence leads us to infer that Federal Express knew about the status reports at the time the counterclaim was filed.[15]

The evidence further supports the conclusion that defense counsel, Howard Emmerman, knew about the reports. Emmerman swears that he interviewed Smith before filing the claim for delay. *See* Emmerman Aff. at ¶ 2. However, in his affidavit, he does not deny having heard about the reports from Smith during the interview or deny having seen the reports among the 30,000 pages of documents he examined. In short, despite the opportunity, Emmerman never denies knowledge of the reports.[16] Accordingly, we impose sanctions jointly on Federal Express and its counsel and award plaintiff reasonable attorney's fees and costs associated with

---

**14.** We note that this implicit argument does not address plaintiff's allegation that defendant intentionally concealed the project status reports, despite interrogatories requesting such documents.

**15.** Similarly, the evidence suggests that the defendant intentionally concealed the damaging documents. In April, 1991, plaintiff served a request for any project status reports Federal Express might have. The project status reports, which we can only conclude were known to Federal Express, were not turned over until March, 1992, after an employee testified to their existence.

**16.** Although counsel may rely on his client's word, that is not the issue here. Here, Emmerman has failed to offer any evidence, not even his own affidavit, that he was unaware of the status reports at the time he filed the counterclaim.

having litigated the delay portions of defendant's counterclaim.[17]

### III. Conclusion

For the foregoing reasons, we deny plaintiff's motions for partial summary judgment on the complaint, deny in part and grant in part its motion for summary judgment on the counterclaim, and grant its motion for sanctions. It is so ordered.

---

17. Although the parties have briefed the issue of attorney's fees and costs, plaintiffs have not isolated how much of these expenses are attributable to the delay allegations, as opposed to other claims. Accordingly, we refer this matter to Magistrate Judge Rosemond to determine the reasonable attorney's fees and costs specifically related to litigating the delay claims.